**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

Plaintiff,

v. No. 26-CR-01851-SMD

ANGEL DE JESUS MORALES-AGUIRRE,

Defendant.

# ORDER DENYING DEFENDANT'S FIRST MOTION TO SUPPRESS

THIS MATTER is before the Court on Defendant's First Motion to Suppress. Doc. 29 ("Mot. to Suppress"). Having considered the motion, the government's response and sur-reply, the motion hearing testimony, all tendered Exhibits, the parties' proposed findings of fact and conclusions of law, and the relevant law, the Court **DENIES** Defendant's motion to suppress. *See* Doc. 37 ("Gov't Resp."); Doc. 40 ("Def.'s Reply"); Doc. 45 ("Gov't Sur-Reply"); Doc. 55 ("Def.'s PFF and COL"); Doc. 56 ("Gov't PFF and COL").

## FACTUAL FINDINGS

### I. Initial Encounter: Welfare Check and Inquiry

1. On January 13, 2026, at approximately 4:10 a.m., Border Patrol Agent Javier Murillo was on patrol on New Mexico Highway 9 and came upon a red Mercedes-Benz stopped in the roadway with its hazard lights on and two occupants using cellphone lights to wave down passing vehicles. Tr. 14:4–5, 16–17.

2. The vehicle was in the middle of the eastbound lane instead of on the road's shoulder. *Id.* 15:3–4; 20:9.

3. The two occupants were Defendant and a juvenile. The juvenile was the driver of the vehicle. *Id.* 16:11; 18:7–11; 93:5.

4. Agent Murillo existed his vehicle, identified himself as a Border Patrol agent, and asked the two occupants why they were stalled in the middle of the road. *Id.* 16:17–20. Agent

Murillo characterized his initial contact with Defendant and the juvenile as a "welfare check." *Id.* 20:10.

5. Defendant and the juvenile replied that they had run out of gas and that the car battery was running low. *Id.* 17:5–6. The juvenile said that they were test driving the vehicle because they wanted to purchase it. *Id.* 17:10–11.

6. When asked where they lived, the juvenile answered that he lived in the lower valley. *Id.* 17:16–17. Agent Murillo testified that the lower valley is 30 to 35 miles away from the encounter. *Id.* 17:18. Defendant answered he lived in Ciudad Juárez, Chihuahua. *Id.* 17:22.

7. Early in the encounter, Agent Murillo questioned Defendant and the juvenile about their citizenship and immigration status. *Id.* 16: 21–22.

8. Defendant told Agent Murillo that he was a United States citizen and presented a U.S. passport. *Id.* 18:21–22. A record check indicated Defendant was legally present in the United States with no criminal history. *Id.* 19:4–7. Agent Murillo knew this information "pretty early on." *Id.* 52: 5–6.

9. According to Agent Murillo, the juvenile stated he was in the United States legally but could not provide any documentation. *Id.* 16:21–22; 18:14–19. Agent Murillo ran the juvenile's information but was unable to verify his immigration status. *Id.* 19:8–9.

## II. <u>Vehicle Search</u>

10. Agent Murillo testified that Agent Robles arrived at the scene 15 to 20 minutes after the initial encounter. *Id.* 19:15–17.

11. Upon discussion with Agent Robles, Agent Murillo testified that they asked for and obtained consent to search the vehicle. *Id.* 21:9, 17–18. The agents noticed fresh dirt and sand on the front and rear floorboards. *Id.* 21: 22–25. Agent Murillo asked Defendant and the juvenile if anyone had recently been in the back seat, and both denied it. *Id.* 22:16–17.

12. Agent Murillo testified that Defendant and the juvenile stated they could not open the trunk. *Id.* 21:11–13. During the car search, the two agents could not open the trunk either. *Id.* 22: 23.

13. Defendant and the juvenile said the trunk contained only construction equipment. *Id.* 22:25. The two agents, however, suspected someone was in the trunk at the time. *Id.* 23:1–2.

14. Agent Robles started searching the surroundings for additional signs. *Id.* 23:3–6.

15. Twenty to thirty minutes after Agent Robles' arrival, Agent Robles discovered three sets of footprints near the car's original location. *Id.* 24:11–12. Agent Murillo testified that he and Agent Robles compared the shoe designs and confirmed that two of the sets belonged to Defendant and the juvenile. *Id.* 23:8–18.

16. Information on the juvenile's status was still pending. *Id.* 24:16–17. Agent Robles left the scene to track a possible third subject. *Id.* 24:20–22.

17. At an unknown time, sector radio notified Agent Murillo that the juvenile had temporary protected status. *Id.* 25:20–22. Because he had never encountered temporary protected status before, Agent Murillo called his supervisor for instructions. *Id.* 25:21–23; 26:7.

18. Agent Murillo's supervisor asked him to obtain the juvenile's and Defendant's consent to go to the border patrol station, and Agent Murillo testified that both agreed. *Id.* 26:10–14.

## III. <u>Investigative Detention</u>

19. Agent Murillo told Defendant and the juvenile that they were being "temporarily detained." *Id.* 25:10. While Agent Murillo testified that he could not recall the exact time of the detention, *id.* 36:5, he testified that Agent Robles arrived around 15 to 20 minutes after 4:10 a.m. and spent 20 to 30 minutes tracking footprints. *Id.* 19:22–25; 24:1. Based on this timeline, Defendant was detained at approximately 4:45 or 5:00 a.m.

20. Agent Murillo testified that he gave Defendant and the juvenile the option to either sit in their own car or Agent Robles' heated car. *Id.* 25:13–14.

21. Agent Murillo testified that both agreed to sit in Agent Robles' car. *Id.* 25:15–16.

22. Another agent, Fidel Baca, arrived and only transported the juvenile to the border patrol station. *Id.* 26:20–21; 27:12–13. Agent Murillo could not recall when this happened, only that it was still dark. *Id.* 27:10–11.

23. Defendant remained in Agent Robles' car. *Id.* 27:14–18. Meanwhile, Agent Robles continued advising over the radio that he was still tracking the third possible subject. *Id.* 27:23–25.

24. Agent Murillo contacted the station and asked about the juvenile's status, such as whether additional information was found. *Id.* 28:1–3. The station responded that they were still working on it, and it was uncertain whether the temporary protected status was still valid. *Id.* 28:3–6.

## IV. <u>Release and Arrest</u>

25. Agent Murillo testified that he released Defendant at around 7:00 a.m. *Id.* 29:4–7. Defendant's detention lasted approximately two hours to two hours and 15 minutes, beginning when the agents notified him that he was detained at around 4:45 or 5:00 a.m. *Id.* 19:22–25; 24:1

26. Agent Murillo testified that Defendant requested a ride to the nearest port of entry, because his phone had no service, his car ran out of gas, and there was nobody to pick him up. *Id.* 29:10–12, 13–17.

27. Agent Murillo testified that Border Patrol agents do not usually provide courtesy rides. *Id.* 29:13. He called the duty supervisor and obtained approval to provide the ride. *Id.* 29:25–30:6.

28. Agent Miguel Madrid arrived at the scene and provided the ride. *Id.* 30:10, 28–20. Agent Murillo testified that Defendant sat in the back of Agent Madrid's car. *Id.* 31:2. The Border Patrol vehicle was caged, but Defendant remained unrestrained. *Id.* 30:23–24. Agent Madrid proceeded to take Defendant to the Santa Teresa Port of Entry. *Id.* 30:7–9; 34:6–11.

29. Agent Murillo was headed to the Santa Teresa Border Patrol Station, in his own vehicle when, approximately three minutes away from the station, he heard over the ratio that the third subject had been apprehended in the desert and admitted to being in a red vehicle that had run out of gas. *Id.* 31:8; 12–20.

30. At approximately 7:45 a.m., Agent Murillo contacted the duty supervisor, stating that Defendant had been released and was being transported to the Santa Teresa Port of Entry. *Id.* 32:5; 34:11. Agent Murillo asked whether they should instead take Defendant to the Santa Teresa Border Patrol Station, and the supervisor agreed. *Id.* 32:12–17.

31. Defendant was then transported to the Santa Teresa Border Patrol Station, rather than the Port of Entry. *Id.* 34:16–17.

32. Santa Teresa Border Patrol Station and Santa Teresa Port of Entry are two separate locations.[1] *Id.* 34:4–17.

33. The first report describing the events of January 13, 2026 is written by "Santiago Nava," an agent whom Agent Murillo testified he does not know. *Id.* 60:10–12. Agent Murillo testified that he has no knowledge of how that report was written or where its author obtained the information. *Id.* 60:12–17.

34. Agent Murillo testified that he wrote a report himself on January 13, 2026, the day of the encounter, and that it had been in the Border Patrol's system since that time, even though the report bears an April 21, 2026 date. *Id.* 40:23–41:5.

35. Agent Murillo wrote a supplemental report on June 9, 2026, the day after the government filed its response to the motion to suppress. *Id.* 68:6–8; 148:10. Agent Murillo testified that he drafted the supplemental report following a phone call with the AUSA. *Id.* 33:2–5. He explained that he included the additional facts because a summary was no longer sufficient. *Id.* 33:10–17.

36. The supplemental report includes the following previously unreported facts: the request for consent to search the vehicle, the observation about fresh sand on the front and rear floorboards of the car, the offer of a heated vehicle without constraints, the 7:00 a.m. advisement of release, and Defendant's request for a ride to the nearest port of entry. *See* Doc. 40-1. Agent Murillo agreed each was an "important fact" and that none appeared in his first report. Tr. 61:25–62:6; 7–11; 12–16; 64:3–8; 9–14; 15–20.

37. Agent Murillo testified that he did not use a lapel camera on January 13, 2026, and that it was possible he took pictures that day. *Id.* 42:6–8, 11–13.

## V. <u>Interview at the Border Patrol station</u>

38. At the Border Patrol station, Agent Erika Gonzalez, along with Agent Enrique Gutierrez, interviewed Defendant. *Id.* 92:13–15.

---

[1] The Santa Teresa Port of Entry and Santa Teresa Border Patrol Station are located approximately six minutes apart by car. Santa Teresa Port of Entry to Santa Teresa Border Patrol Station, https://maps.app.goo.gl/sy5jfwaCWZojUUWb7 (last visited Aug. 5, 2026).

39. Agent Gonzalez testified that Defendant was the second person she interviewed that day. *Id.* 94:4–7. The juvenile was prioritized and interviewed first because of his age. *Id.* 93:4–8.

40. Agent Gonzalez testified that she asked if Defendant wanted food or water before the interview. *Id.* 109:2–3.

41. At around 10:50 a.m., Defendant was advised of his *Miranda* rights via a I-214 form. *Id.* 91:17–21; 128:22–24.

42. The I-214 form used by the agents was written in Spanish, and the rights were read to Defendant in Spanish. Gov't Ex. 1. Agent Gonzalez testified that the *Mirada* rights on the I-214 form was read verbatim, and that Defendant acknowledged understanding them. *Id.* 92:20; 117:21.

43. Agent Gonzalez testified that she is a fluent Spanish speaker. *Id.* 90:24–91:1.

44. Agent Gonzalez testified that Defendant responded to the agents' questions without difficulty and appeared to understand everything being said. *Id.* 96:5–7, 22–24. Agent Gonzalez further testified that the interview proceeded normally, with nothing out of the ordinary occurring. *Id.* 101:4–7.

45. Form I-215 is a summary in question-and-answer form, not a word-for-word transcript of the interview. *Id.* 117:3–5; *see* Gov. Ex. 2. Form I-215 is written completely in English. *Id.* 121:24–122:1.

46. Agent Gonzalez testified that she did not read Form I-215 verbatim to Defendant before he signed it. Instead, she testified that she summarized the form for him and explained that the form contained his declaration that he picked up an illegal alien. *Id.* 122:2–8.

47. Agent Gonzalez testified that she asked Defendant if he wanted more explanation. Defendant stated "No" and proceeded to sign Form I-215. *Id.* 122:10–11.

## DISCUSSION

### I. The Agent Had Reasonable Suspicion to Begin Questioning.

The parties do not dispute that the encounter started as a consensual welfare check. *See* Def.'s COL ¶ 4; Gov't PFF ¶ 5. Defendant argues that the welfare check transformed into an illegal seizure at one of two points: either when Agent Murillo first inquired about his immigration status,

or alternatively, when Agent Murillo decided not to immediately release him after confirming his U.S. citizenship and lack of a criminal history. *See* Def.'s COL ¶ 4. The Court disagrees. Because Agent Murillo had reasonable suspicion to continue questioning, the encounter did not become an illegal seizure at either the initiation of the immigration inquiry or upon the verification of Defendant's citizenship.

Defendant correctly points out that Agent Murillo inquired about his immigration status very early in the encounter. *See id.* Agent Murillo testified that conducting immigration inspections was part of his duties, noting that he moved the vehicle only after Defendant and the juvenile claimed that they were "in the United States legally." Tr. 16:21–23. Accordingly, Defendant argues that the consensual welfare encounter ripened into an investigative seizure the moment Agent Murillo began questioning him regarding his immigration status. *See* Def.'s COL ¶ 4.

The Court is not persuaded that the encounter transformed into a seizure at the outset of the interaction, when Agent Murillo first inquired of Defendant and the juvenile about their immigration status. Since *Terry*, the Supreme Court has held repeatedly that mere police questioning does not constitute a seizure, clarifying that officers may generally ask questions even when they lack a specific basis for suspecting an individual. *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *see also INS v. Delgado*, 466 U.S. 210, 212 (1984). In this case, several factors provided Agent Murillo with justification to initiate the inquiry: the encounter occurred at 4:10 a.m. on a desolate road known for smuggling, and the vehicle was positioned in the middle of the roadway rather than on the shoulder. *See* Tr. 15:22; 19:20; 20:9. Given these circumstances, the agent's decision to approach and question Defendant did not constitute an illegal seizure.

Alternatively, Defendant contends that Agent Murillo lacked a continuing basis to detain him and was required to release him immediately once his U.S. citizenship and lack of a criminal history were verified. *See* Def.'s COL ¶¶ 6–8. The Court is unpersuaded. Even excluding the later-discovered footprints, the facts known to Agent Murillo at that time justified further inquiry. Contrary to Defendant's assertion, the information available to the agent was not confined to generalized environmental factors. Specifically, the juvenile stated that he and Defendant were test-driving the vehicle at 4:10 a.m. to evaluate it for purchase, despite being 30 to 35 miles away from the juvenile's residence. *See* Tr. 17:17–19. Agent Murillo did not state the distance to Defendant's residence, noting only that Defendant claimed to live in Ciudad Juárez, Chihuahua, which the Court notes is a different country from where they were encountered. *Id.* 17:21–22. Furthermore, Agent Murillo had not yet searched the vehicle and suspected an individual might be concealed inside the trunk, especially after the juvenile and Defendant claimed that they were unable to open the trunk. *See id.* 21: 11–16; 22:23.

In *United States v. Cheromiah*, the Tenth Circuit found that reasonable suspicion existed based on the following facts: (1) the encounter occurred 85 miles from the border in an area frequented by smugglers to avoid Border Patrol checkpoints; (2) the vehicle was a van, which typically are used to carry illegal aliens and conceal contraband; (3) the van had a temporary Texas tag; (4) when approached by the agent, the driver and passenger stiffened up and avoided eye contact; one passenger in the vehicle was crouching down as the agent approached. 455 F.3d 1216, 1221 (10th Cir. 2006).

In *United States v. Quitana-Garcia*, the Tenth Circuit held that reasonable suspicion existed because (1) the route was known for smugglers; (2) the vehicle had a Mexican plate; (3) the vehicle

slowed down considerably when its occupants saw the Border Patrol vehicle. 343 F.3d 1266, 1270 (10th Cir. 2003).

In *United States v. Barbee*, the Tenth Circuit found reasonable suspicion because (1) the route was known for smugglers; (2) the vehicle had an out-of-state, Texas license plate; (3) the passengers were crouching down after the agents began to follow the vehicle. 968 F.2d 1026, 1028 (10th Cir. 1992).

In sum, beyond the time of the day, proximity to the border, and the road's history as a smuggling corridor, Agent Murillo had particularized information supporting reasonable suspicion. This included the significant distance from the homes of the juvenile and Defendant, as well as their somewhat untenable explanation that they were on a remote road at 4:10 a.m. to test-drive a car. Tr 15:22–24.

The Tenth Circuit has long recognized that law enforcement officers "may perceive meaning in actions that appear innocuous to the untrained observer." *United States v. Cantu*, 87 F.3d 1118, 1121 (10th Cir. 1996). At this stage, after Defendant's immigration status was verified but prior to Agent Robles' arrival, the facts presented to Agent Murillo were not entirely innocuous. Indeed, these circumstances are at least as compelling as those in which the Tenth Circuit has found reasonable suspicion to exist.

## II. The Investigative Detention Was Supported by Reasonable Suspicion at its Inception.

The agents had reasonable suspicion to conduct an investigative detention of Defendant after the initial questioning. Upon Agent Robles' arrival at approximately 4:25 or 4:30 a.m., the agents obtained consent to search the car and observed fresh dirt on both the front and rear floorboards. *See* Tr. 21:22–25. Because they could not open the trunk, the agents suspected someone might be concealed inside, despite denials from both Defendant and the juvenile. *See id.*

22:23. Agent Robles subsequently started to investigate the surroundings and, within 10 or 15 minutes, discovered three sets of footprints near the car's original location. Agent Murillo testified that two sets of those footprints matched the designs of Defendant's and the juvenile's shoes. *See id.* 23:3–12.

The Court finds that the investigative detention began between 4:45 a.m. and 5:00 a.m. This was when Agent Robles discovered the shoeprints, and Agent Murillo explicitly informed Defendant and the juvenile that they were detained. *See id.* 25:9–10

An investigative detention has occurred only when an officer, "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). To determine whether an officer has made such a show of authority, courts sometimes ask whether "a reasonable person would have believed that he was not free to leave." *Brendlin v. California*, 551 U.S. 249, 255 (2007); *United States v. Tafuna*, 5 F.4th 1197, 1200 (10th Cir. 2021). To be clear, the test is not what the defendant himself thought, but what a reasonable, law-abiding person would have thought had he been in the defendant's shoes. *Tafuna*, 5 F.4th at 1200; *United States v. Sanchez*, 89 F.3d 715, 717–18 (10th Cir. 1996).

Here, Defendant has not identified any evidence of a coercive show of authority prior to the moment Agent Murillo declared that he was detained. Specifically, leading up to that point, nothing indicates that the agents refused to return his documents, displayed weapons, physically touched him, or used an intimidating tone or body language. *See, e.g., United States v. Chavira*, 467 F.3d 1286, 1291 (10th Cir. 2006); *United States v. Taverna*, 348 F.3d 873, 879 (10th Cir. 2003) (holding that a defendant who consented to a vehicle search while sitting in a patrol car was not detained). Moreover, the agents were not required to inform Defendant he was free to leave. *See Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996); *Chavira*, 467 F.3d at 1291 ("Advising a defendant

that he is free to leave is not an essential prerequisite for a consensual encounter, let alone a voluntary consent to search."); *Taverna*, 348 F.3d at 879; *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005); *United States v. Elliott,* 107 F.3d 810, 814 (10th Cir. 1997).

The Court further finds that the initial investigative detention was supported by reasonable suspicion. Under the Fourth Amendment, an investigative detention is a seizure of limited scope and duration that requires suspicion of criminal activity. *See United States v. White*, 584 F.3d 935, 944–45 (10th Cir. 2009). A brief detention is permissible if based on "reasonable suspicion to believe that criminal activity may be afoot." *Quintana-Garcia*, 343 F.3d at 1270. In other words, all that reasonable suspicion requires is "some minimal level of objective justification." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). And while a mere hunch is not enough, the detaining officer need not rule out innocent explanations before concluding the totality of information known to the officer, combined with experience, supports a brief investigatory detention. *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *Sokolow*, 490 U.S. at 7, 10.

The car was searched at this time, with the juvenile driver's consent. At the moment Agent Murillo decided to detain Defendant, the agent knew that: (1) fresh dirt and sand were on the front and rear floorboards, yet Defendant and the juvenile denied a third person had sat there; (2) three sets of footprints were found nearby, two of which matched the shoes worn by Defendant and the juvenile; (3) the car's trunk could not be opened and had not yet been searched; (4) the juvenile's immigration status remained unconfirmed. *See* Tr. 21:23; 23:12; 22:23; 19:9. Based on this information, the agents had the minimal level of objective justification required to establish reasonable suspicion, which authorizes them to temporarily detain Defendant while attempting to locate the potential third subject.

### III. A Two-Hour Investigative Detention Pushes the Boundaries of Fourth Amendment Permissibility, But Is Not Per Se Unconstitutional.

Defendant was detained from approximately 4:45 a.m. until his release at around 7:00 a.m., a total duration of two hours and 15 minutes. *See* Tr. 24:1; 29:7. Having concluded that the initial detention was lawful, the Court must next address whether the detention was reasonable in length and scope. While facts support both sides of the argument, the two-hour timeline presents a close, borderline case because it exceeds the Tenth Circuit's 90-minute reference point for investigative detentions and approaches a de facto arrest requiring probable cause. On balance, however, the Court leans toward the position that the detention remained constitutionally permissible.

"[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.*

The Supreme Court has declined to adopt a rigid time limit for the kind of stop permitted under *Terry v. Ohio*, 392 U.S. 1, 5 (1968). *See Illinois v. McArthur*, 531 U.S. 326, 332 (2001) (finding a two-hour restraint reasonable where police prevented a suspect from entering his home unaccompanied while they obtained a search warrant.); *see also United States v. Frost*, 999 F.2d 737, 742 (3d Cir. 1993) (upholding an 80-minute detention where delay in bringing a drug-sniffing dog to the airport was not due to officers' lack of diligence); *United States v. Bejarano-Ramirez*, 35 F. App'x 740, 745 (10th Cir. 2002).

However, in the absence of probable cause, the Supreme Court found in *Place* that a 90-minute delay of a suspect's luggage in an airport was unreasonable where the delay resulted from the officer's lack of diligence. *See United States v. Place*, 462 U.S. 686, 708 (1983). "Although there is no rigid time limit on an investigative detention, 'it is clear that the brevity of the invasion

of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion.'" *Manzanares v. Higdon*, 575 F.3d 1135, 1148 (10th Cir. 2009) (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)).

As the Tenth Circuit observed in *Manzanares*, the Supreme Court "has never held a detention of 90 minutes or longer to be anything short of an arrest." *Manzanares*, 575 F.3d at 1148 (quoting *Place*, 462 U.S. at 709–710). Indeed, the Tenth Circuit's "research reveals no case that construing a detention of 90 minutes or longer as an investigative detention." *See, e.g., Walker v. City of Orem*, 451 F.3d 1139, 1150 (10th Cir. 2006) (90-minute detention constituted an arrest); *United States v. Edwards*, 103 F.3d 90, 93 (10th Cir.1996) (45-minute detention constituted an arrest); *United States v. Shareef*, 100 F.3d 1491, 1501–02 (10th Cir.1996) (30 and 45-minute detentions did not constitute arrests).

In *Manzanares*, where the subject was handcuffed and held in the back of the squad car for more than three hours, the Tenth Circuit emphasized that this duration was more than twice as long as the 90-minute reference point established by the Supreme Court in *Price*. *Manzanares*, 575 F.3d at 1148. The court concluded that the length of the detention "alone provides strong evidence that [subject] was under arrest rather than merely subject to an investigative detention." *Id.*

Here, Defendant's detention of approximately two hours to two hour and 15 minutes similarly exceeds the 90-minute reference point. Unlike the subject in *Manzanares*, however, who was handcuffed and confined throughout the encounter, Defendant here voluntarily chose to sit in the Border Patrol vehicle, unrestrained. Yet, while the absence of physical restraints distinguishes this case from *Manzanares*, the sheer duration of the stop remains a critical factor under Tenth Circuit precedent. The government concedes that probable cause to arrest Defendant did not exist

until the third individual was apprehended. *See* Gov't Resp. at 10 ("Only once they were on the way to transport the defendant to where he wanted to go was the probable cause for his arrest established."). Consequently, if the two-hour investigative detention exceeded its lawful limits and escalated into an arrest, there was no requisite probable cause to justify it. Tr. 74:13–17.

However, in addition to Defendant voluntarily sitting in the Border Patrol vehicle and the lack of record showing a coercive manner by the agents, several other facts support the conclusion that the detention likely did not escalate into a de facto arrest. Throughout the encounter, Border Patrol agents pursued the investigation with diligence while Defendant remained detained in the vehicle. *See Place*, 462 U.S. at 709 ("Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation.") Specifically, Agent Murillo continued to verify the juvenile's immigration status, Agent Robles regularly reported radio updates regarding his tracking of the third individual, and Agent Murillo contacted his supervisor once investigation stalled to determine if release was necessary. Tr. 27:22–25; 28:1–4, 10–17; 29:18–24.

In *United States v. Rosborough*, the Tenth Circuit held that a two-and-a-half-hour detention did not violate the durational limits of the Fourth Amendment, finding that the law enforcement obtained the defendant's consent and acted diligently under the circumstances. 366 F.3d 1145, 1150 (10th Cir. 2004). Similarly, the facts here suggest that although long in duration, the detention probably did not transform into a de facto arrest. The 90-minute reference point serves as a guideline rather than a bright-line, per se rule.

**IV. Defendant's Release Attenuated Any Constitutional Violation.**

The Court further finds that even if the detention ripened into an arrest without probable cause, Defendant's subsequent release attenuated the resulting constitutional violation. To

demonstrate that the taint of an illegal seizure has dissipated, "the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent." *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996). This is a heavy burden. *See id.* In *Brown v. Illinois*, the Supreme Court identified three factors relevant to this inquiry: "1) the temporal proximity between the police illegality and the confession given; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the official misconduct." *United States v. Fox*, 600 F.3d 1253, 1259–60 (10th Cir. 2010) (citing *Brown*, 422 U.S. at 603–04).

The first factor, temporal proximity, weighs against a finding of attenuation. Only about 45 minutes separated Defendant's release at around 7:00 a.m. from his arrest at 7:45 a.m. Under established caselaw, this brief interval is insufficient to support attenuation absent significant intervening circumstances. *Utah v. Strieff*, 579 U.S. 232, 239 (2016); *United States v. Mendoza–Salgado*, 964 F.2d 993, 1012 (10th Cir. 1992) (30 to 45 minute period by itself "reveal[ed] little about whether the [time] that elapsed had any effect on [the] decision to permit the search"); *United States v. Maez*, 872 F.2d 1444, 1455 (10th Cir. 1989) (30 minute time period between "the arrest and Mrs. Maez's consents clearly indicate that [the] taint [of the Fourth Amendment] violation was not purged"); *United States v. Muse*, 428 F. Supp. 3d 1186, 1199 (D.N.M. 2019) (finding that three and a half hours after the unlawful arrest was not enough for the taint to have been sufficiently attenuated).

Because Defendant's release constitutes an intervening circumstance, the second *Brown* factor favors the government. Under the second *Brown* factor, "there must be proof of facts or events which ensure that the consent provided . . . [was] not the fruit of the illegal [seizure]. The facts or events must create a discontinuity between the illegal [seizure] and the consent such that

the original illegality is weakened and attenuated." *Gregory*, 79 F.3d at 980; *see also United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003). Some examples of intervening circumstances include "release from custody, an appearance before a magistrate, or consultation with an attorney." *Fox*, 600 F.3d at 1260–61; *United States v. Washington,* 387 F.3d 1060, 1074 (9th Cir. 2004).

At approximately 7:00 a.m., Agent Murillo told Defendant that he was free to go. *See* Tr. 29: 4–6. This release from custody severed the causal chain between the preceding Fourth Amendment violations resulting from the prolonged detention and Defendant's subsequent statements given at the Border Patrol station. *See Jiron v. Roth*, 519 F. Supp. 3d 971, 994 (D.N.M. 2021); *Muse*, 428 F. Supp. 3d at 1200; *United States v. Cooper*, 103 F. Supp. 3d 1286, 1296 (D.N.M. 2015).

Defendant counters that even if Agent Murillo released him at 7:00 a.m., that release was entirely illusory. He was, in his words, "a stranded man with no phone, no vehicle, and nowhere else to be," and the release was immediately followed by another multi-hour stretch of the same unbroken custody. Def.'s COL ¶ 23. Specifically, because his phone had no service and his vehicle was out of gas, Defendant contends that he had no choice but to request a ride from the agents. Consequently, because he remained inside a Border Patrol vehicle throughout the encounter and never truly left federal custody, Defendant argues the causal chain between the illegal prolonged detention and his subsequent statement at the Border Patrol station remained unbroken. *See id.* ¶¶ 22–24.

As the Tenth Circuit has recognized, "when a person 'has no desire to leave for reasons unrelated to the police presence,'' the better question is "whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Tafuna*, 5 F.4th at 1200. Once Defendant was informed he was released, he was no longer under detention or arrest,

and the encounter was terminated. The fact that he was stranded in a remote area without phone service and with a disabled vehicle is undoubtedly worthy of sympathy; however, his predicament was not the result of law enforcement conduct. *See Bostick*, 501 U.S. at 436.

The Supreme Court directly addressed this line of reasoning in *Florida v. Bostick* and in *INS v. Delgado*. In *INS v. Delgado*, the Court held that employees questioned at their workplace were not seized under the Fourth Amendment, despite being practically unable to leave the job site. The Court observed: "Ordinarily, when people are at work their freedom to move about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers' voluntary obligations to their employers." *Delgado*, 466 U.S. at 218.

Similarly, in *Florida v. Bostick*, the defendant argued that he was subject to a de facto detention because police officers approached him on a bus, a confined environment he was not free to leave. The Supreme Court rejected this argument, clarifying that his restricted freedom of movement was "the natural result of his decision to take a bus" and was "restricted by a factor independent of police conduct." *Bostick*, 501 U.S. at 436.

On this record, the Court is not persuaded that Defendant was left with no alternatives but to remain in Border Patrol custody. Realistic options remained available to Defendant, and he was no less free than a bus passenger approached by law enforcement. Admittedly, the nearest port of entry was distant and difficult to reach on foot. But because Agent Murillo was in contact with his supervisors, the agent's phone clearly had service. *See* Tr. 29:18; 45:14; 61:11. Defendant could have asked to borrow the phone to contact family, friends, or a commercial transportation service, particularly given that it was 7:00 a.m. already. Ultimately, regardless of whether Defendant had realistic alternatives, law enforcement did not cause Defendant to be stranded and therefore cannot be said to have maintained a de facto detention after informing him of his release.

Furthermore, the agents did not pressure Defendants to remain in their custody or inside their vehicle. Although Agent Murillo knew Defendant lacked food, water, and phone service, he did not offer him a ride. To the contrary, Defendant requested a courtesy ride on his own initiative. Because Border Patrol agents do not ordinarily provide courtesy rides, Agent Murillo had to secure approval from his supervisor to accommodate Defendant's request. *See id.* 29:13, 18.

The third *Brown* factor, the purpose and flagrancy of the official misconduct, likewise favors the government. According to Agent Murillo's testimony, he was mindful of the detention's length and recognized that it would eventually exceed permissible limits if prolonged. *See id.* 28:10–17. He explained that because the agents had not located the third individual and had not received further information on the juvenile, releasing Defendant had become "necessary." *See id.* 28:20. Agent Murillo offered Defendant the option to wait inside the heated Border Patrol car during the cold morning, demonstrating a non-coercive demeanor. *See id*. 25:14. Furthermore, Agent Murillo stayed in contact with his supervisors at various stages of the encounter to consult on how to handle the juvenile, to arrange the release once field progress stalled, and to secure authorization for the courtesy ride. *See* Tr. 29:18; 45:14; 61:11.

While the two-hour detention pushes the outer boundaries of a permissible investigative detention, Agent Murillo's actions do not reflect the type of purposeful or flagrant misconduct that the third *Brown* factor targets.

Upon balancing the three *Brown* factors, the Court concludes that Defendant's release sufficiently attenuated the taint of the prolonged detention. Defendant made no incriminating statements during this detention, nor did he make any statements as a result of it. Instead, the statement was given only after Defendant was arrested with probable cause and transported to the Border Patrol station. It is arguable that regardless of whether this detention had been shorter or

longer, Defendant's arrest would have inevitably occurred once the third individual was apprehended.

### V. The Delay in Presentment was Reasonable and Did Not Violate the *McNabb-Mallory* Rule.

The government points out that Defendant raised two new arguments for the first time in his reply brief, despite having ample time to raise them in his initial motion because the disclosures were made on March 10, April 13, and April 15, 2026. Gov't Sur-Reply at 1. While courts in this circuit generally decline to consider arguments raised for the first time in reply brief because the opposing party lacks a fair opportunity to respond, courts retain the discretion to both construe motions liberally and depart from the general waiver rule. *See Daigle v. Shell Oil Co.*, 972 F.2d 1527, 1539 (10th Cir. 1992); *Gonzales v. McCabe*, No. 2:23-CV-01071-GJF-KRS, 2024 WL 5074568, at *4 (D.N.M. Dec. 11, 2024). The Court elects to address Defendant's two new arguments. Because the Court permitted the government to file an 18-page sur-reply, any potential prejudice from the late-raised issues has been removed.

Defendant next argues that his statements at the Border Patrol station must be suppressed under the *McNabb-Mallory* rule. Under this rule, a confession obtained before presentment and beyond six hours must be suppressed if the delay was unreasonable or unnecessary, even where the statement is otherwise voluntary and preceded by *Miranda* warnings. The Court finds, however, that no unreasonable or unnecessary delay occurred. Although Defendant's confession was given approximately six hours and five minutes after he was initially detained, the brief delay was not unreasonable under the circumstances.

Federal law requires an arrestee to be promptly presented to a federal magistrate judge. *See Corley v. United States*, 556 U.S. 303, 308 (2009). "[E]ven voluntary confessions are inadmissible if given after an unreasonable delay in presentment." *Id.* (citing *Upshaw v. United*

*States*, 335 U.S. 410, 413 (1948); *United States v. Yazzie*, 998 F. Supp. 2d 1044, 1092 (D.N.M. 2014). Consequently, if a confession occurs prior to presentment and beyond the statutory six-hour window, the Court must decide whether the delay was unreasonable or unnecessary under the *McNabb-Mallory* cases, and if it was, the confession must be suppressed. *Corley*, 556 U.S. at 322.

The prompt presentment requirement dates back to the common law, enacted to give the defendant a chance to consult with counsel and to prevent federal agents from questioning suspects for extended periods before bringing them out in the open. *See id.* at 306. This rule recognizes that "custodial police interrogation, by its very nature, isolates and pressures the individual," inducing people to confess to crimes they never committed. *Id.* at 320.

This is not how events unfolded in this case. As explained above, Defendant was not detained until Agent Murillo formally informed him of his detention between 4:45 and 5:00 a.m. *See* Tr. 24:1. Because Defendant gave his confession at approximately 10:50 a.m., roughly six hours and five minutes elapsed between the initial detention and his statement. *See id.* 96:3. If the Court accounts for the 45 minutes during which Defendant was released, the actual period of detention falls squarely within the six-hour safe harbor.

Yet even if the Court does not consider the 45-minute release, the brief delay past the threshold was both minimal and reasonable. Before his interview, Defendant was provided a meal. Doc. 45-1 at 2. Agents interviewed Defendant only after questioning the juvenile, whose status as a minor required priority in processing. Accordingly, Defendant was not subject to the type of prolonged, isolating custodial interrogation that the *McNabb-Mallory* rule was designed to prevent. *United States v. DeLeon*, 326 F. Supp. 3d 1257, 1293 (D.N.M. 2018).

## VI. Defendant Failed to Establish the Statement Was Involuntary.

Lastly, Defendant argues that neither his statement nor his consent to search his phone were given knowingly, intelligently, or voluntarily. Def.'s COL ¶¶ 47–49. He bases this challenge on two grounds: (1) there was no video recording of the station interview, and (2) Agent Gonzalez's testimony is contradictory and lacks credibility. The Court is unpersuaded by either argument and finds that Defendant's statements and consent to search were voluntary.

The Fifth Amendment does not require the recording of post-arrest statements. *See United States v. Yunis*, 859 F.2d 953, 961 (D.C. Cir. 1988) ("There is no constitutional requirement that confessions be recorded by any particular means."); *see also United States v. Guillen*, No. 17-CR-1723-WJ, 2018 WL 2075457, at *15 (D.N.M. May 3, 2018), *aff'd*, 995 F.3d 1095 (10th Cir. 2021). Although a video recording would have been helpful in resolving the present dispute, the Court will not make negative inferences regarding the voluntariness of the confession solely because the agents did not record the interview. *See Guillen*, 2018 WL 2075457, at *15.

An express written statement of waiver, such as the "advice of rights" form signed by the defendant, is strong proof of the waiver's validity. *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Boyd*, 31 F. App'x 601, 603 (10th Cir. 2002). Agent Gonzalez testified that the *Miranda* rights were read to Defendant verbatim in Spanish, after which Defendant stated that he understood and signed his name. *See* Tr. 91:20.

Defendant further argues that Agent Gonzalez provided inconsistent statements regarding the presence of cameras in the interview room, thereby rendering her testimony regarding voluntariness incredible. *See* Def.'s COL ¶ 49. While this testimony was not the model of clarity, the Court is unpersuaded that the testimony was not credible and that the statements were involuntary.

When asked during the suppression hearing whether cameras are located inside the interview room, Agent Gonzalez testified: "There are. I think they should be working. We have cameras in the whole station." Tr. 89:10–11. Conversely, an email correspondence dated April 15, 2026, between Agent Gonzalez and Delilah Gell, New Mexico AUSA Liaison, reveals that Gell inquired whether Defendant's interview was recorded, to which Agent Gonzalez responded: "We checked our records for this event, and we did not record the interview." *See* Doc. 54-2 at 2.

Defendant argues that this earlier email response directly contradicts Agent Gonzalez's hearing testimony that the interview room cameras were operational. *See* Def.'s COL ¶ 49. That argument is mistaken. Agent Gonzalez unequivocably testified that although the cameras in the room were functional, the agents did not record the session on any other devices like body-worn cameras. When asked directly whether the cameras recorded her interview with Defendant, Agent Gonzalez answered: "No, no, no. We didn't have any devices on us to record that day at all. Like I said, there's a camera inside the room, but we weren't recording ourselves." Tr. 90:13–16. Agent Gonzalez was also consistent in explaining that while cameras throughout the facility captured video footage, those devices did not record audio. *Id.* 105:16–18.

Ultimately, the status of the station's security cameras has little bearing on whether Defendant's waiver and subsequent confession were voluntary. Recording the interview was not legally required. Regardless, the Court finds that Agent Gonzalez's testimony on this matter was consistent and credible.

## CONCLUSION

For the foregoing reasons, the Court **FINDS**:

1. The Border Patrol agent had reasonable suspicion to ask immigration questions during the initial encounter;

2. The vehicle search, combined with the observation of footprints and fresh dirt, provided reasonable suspicion to support the inception of the investigative detention;

3. It is a borderline case whether the approximately two-hour detention transformed into an arrest, but it likely did not because the agents worked diligently and there was no evidence of a coercive show of authority;

4. Even if the detention transformed into an arrest without probable cause, a balancing of the *Brown* factors, particularly Defendant's release, leads to the conclusion that any illegality would be attenuated;

5. The delay in presenting Defendant before a magistrate judge did not violate the *McNabb-Mallory* rule;

6. Defendant failed to establish that the statement given at the Border Patrol station was involuntary.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Suppress (Doc. 29) is **DENIED**.

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**