**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

Plaintiff,

v. No. 26-cr-01851-SMD

ANGEL DE JESUS MORALES-AGUIRRE,

Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS**

THIS MATTER is before the Court on Defendant's motion to dismiss indictment. Doc. 41 ("Mot. to Dismiss"). Having considered the motion, the government's response (Doc. 48) ("Resp."), the reply (Doc. 57) ("Reply"), Defendant's Notice of Supplementation of the Record (Doc. 54), all tendered exhibits, transcript of the suppression hearing (Doc. 43), and the relevant law, the Court **DENIES** Defendant's motion to dismiss.

**FACTUAL FINDINGS**

Defendant Angel De Jesus Morales-Aguirre has been indicted on three counts: transporting illegal aliens, conspiracy to transport illegal aliens, and aiding or assisting certain inadmissible aliens to enter the United States. *See* Docs. 19, 81. On January 13, 2026, at approximately 4:10 a.m., Border Patrol Agent Javier Murillo encountered Defendant and a juvenile on New Mexico Highway 9. Tr. 14:4. The red Mercedes-Benz previously occupied by Defendant and the juvenile was found stranded in the middle of the lane, running out of fuel. *Id.* 14:15–17; 15:2–5.

Agent Murillo inquired about their immigration status and verified Defendant's United States citizenship. *Id.* 16:14–16; 18:22. The juvenile claimed he was a non-citizen with valid status to remain in the country, though his status could not be verified at that time. *Id.* 19:7–9. The juvenile further claimed that he and Defendant were test-driving the car before purchasing it, despite the location being at least 30 to 35 miles from where they lived. *Id.* 17:9–11, 17–19.

Unsatisfied by these answers and suspecting another individual was in the trunk, Agent Murillo and Agent Robles, who arrived at the scene 15 to 20 minutes after the initial encounter, obtained permission to search the car. *Id.* 19:15–16; 21:4–10. During the search, the agents spotted fresh dirt on the front and rear floorboards and discovered three sets of footprints nearby. Agent Murillo then informed Defendant and the juvenile that they were temporarily detained. *Id.* 21:22–25. Subsequently, the juvenile was transported to the Santa Teresa Border Patrol Station, while Defendant remained at the scene inside a Border Patrol vehicle. *Id.* 25: 1–16.

Defendant was initially released at approximately 7 a.m. after the agents made no significant progress tracking the third individual or verifying the juvenile's status. *Id.* 29:4–7. Following his release, Defendant requested a ride from the Border Patrol agents. During the transport to the nearest port of entry, Defendant was placed under arrest because the third individual was apprehended. *Id.* 29:10–12; 32:8–13. Upon apprehension, that individual gave a statement confirming that he was a noncitizen who was being illegally transported in a red Mercedes-Benz. *Id.* 31:13–20. Defendant was then transported to the Santa Teresa Border Patrol station, where Agent Erika Gonzalez and Agent Enrique Gutierrez interviewed him. *Id.* 8:24–25; 9:1. At approximately 10:50 a.m., after being read his *Miranda* rights in Spanish and signing the waiver forms, Defendant gave an incriminating statement. *Id.* 96:3.

On June 25, 2026, Defendant filed the present motion to dismiss the indictment based on multiple government discovery violations that surfaced during that hearing. *See* Doc. 41. Specifically, Defendant points to the government's late disclosure of Jencks materials, its failure to disclose crime scene photographs and photographs of Defendant's phone, and the deletion of video recordings from the Border Patrol station. The defense contends these nondisclosures violate due process or, alternatively, constitute *Brady/Giglio* violations.

## DISCUSSION

### I. No Due Process Violations Occurred Under *Arizona v. Youngblood*.

Defendant argues that the government violated due process by failing to preserve the following evidence: (1) photographs of the scene possibly taken and deleted by Agent Murillo, and (2) videos at the Santa Teresa Border Patrol Station.

a. <u>It Is Uncertain Whether Agent Murillo Deleted Photographs.</u>

During cross examination at the June 24, 2026 suppression hearing, government witness Agent Murillo testified that he did not recall whether he took pictures on January 13, 2026, the day of the encounter. Tr. 42: 9–10. He further stated that he could not recall if any such photos were ever stored on his phone or subsequently deleted. *Id.* 42:17–19. However, Agent Murillo admitted that he had deleted crime scene investigation photos in the past. *Id.* 43: 2–9.

Based on this testimony, Defendant argues that the government's failure to gather and preserve the potential photo evidence from the scene violates due process. Mot. to Dismiss at 6, 10. Defendant concedes that, at this stage, he is not asking the Court to resolve whether photos were actually taken or deleted. *Id.* at 10. Instead, Defendant asserts that the government has a duty to preserve potentially material evidence, and that a defendant is legally entitled to all evidence gathered against him. *Id.*

When the government no longer possesses disputed evidence, courts apply *Trombetta* and *Youngblood* to analyze a defendant's due process claim. *Coones v. Bd. of Cnty. Comm'rs*, 166 F.4th 1, 17–18 (10th Cir. 2026). With the exception of a photo taken of the red Mercedes-Benz at the scene on January 13, 2026, which is evaluated below under the *Brady/Giglio* framework, the Court reviews the remainder of Defendant's claims under *Trombetta* and *Youngblood*. Because it is unproven whether those additional photos ever existed, and because the government no longer possesses them if they did, the *Brady* framework is inapplicable. *See Coones*, 166 F.4th at 17

(holding that the *Brady* test does not apply to evidence that the government is unable to locate or produce).

Neither *Trombetta* nor *Youngblood* provides relief here because Defendant does not allege that any photos were actually taken. Under both *Trombetta* and *Youngblood*, the threshold requirement is that the government destroyed evidence that actually existed. To invoke *Trombetta*, a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value. *California v. Trombetta*, 467 U.S. 479, 489 (1984); *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994). To trigger *Youngblood*, a defendant must show that the government destroyed "potentially useful evidence." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988); *Bohl*, 25 F.3d at 910. Here, Defendant asserts only that photographs might potentially have existed, while acknowledging that it is possible they did not. Mot. to Dismiss at 10. Because Defendant does not allege that Agent Murillo actually took these photographs, there is no evidence for the government to have destroyed or failed to preserve. Consequently, neither *Trombetta* nor *Youngblood* applies to claims based on purely hypothetical evidence. Defendant argues that the uncertainty surrounding the existence of photographs should not be resolved in the government's favor. *See id.* This argument applies the wrong legal standard. The Court cannot find a due process violation when the existence of the underlying evidence is entirely speculative.

b. Deletion of the Border Patrol Video Does Not Constitute *Youngblood* Bad Faith.

Closed-Circuit Television ("CCTV") footage from the Santa Teresa Border Patrol Station's processing area and interview room existed but was destroyed in mid-April. Defendant argues that the government's failure to preserve such recordings constitutes a due process violation. Applying the *Youngblod* framework, the Court finds no due process violation.

According to a report of investigation, Border Patrol Agent Joshua M. Sifuentes submitted a request on June 26, 2026 for CCTV footage from the Santa Teresa Border Patrol Station's

processing area and interview rooms covering the period of January 13, 2026 from 5:15 a.m. to 8:30 p.m. *See* Doc. 54-4. On June 30, 2026, Supervisory Law Enforcement Information Systems Specialist Travis U. Frazier replied that the requested date was too far back, and the system could not retrieve recordings older than three months. *See id.* This report and the email correspondence between Travis Frazier and Joshua Sifuentes confirm that video recordings of the interview room and processing area did exist at one time. *See* Doc. 54-3. Based on Specialist Frazier's information, the footage from January 13, 2026 would have been deleted in mid-April. *See* Doc. 54-3 at 1.

Both Agent Gonzalez's testimony at the suppression hearing and the email correspondence between her and the New Mexico AUSA Liaison Delilah Gell indicate that except for "what's in the room that the station has for the whole station," the interviewing agents did not record Defendant's January 13, 2026 interview with any separate devices. *See* Doc. 54-2; Tr. 116: 13–15. Agent Gonzalez further testified that she believed the CCTV system at the Border Patrol station records video only, without audio. Tr. 105:16–18.

Defendant argues that the video recordings would have shown the demeanor of the agents and Defendant, which directly bears on the voluntariness of his statements. Mot. to Dismiss at 10. Defendant concedes that *Youngblood*, instead of *Trombetta*, governs his claims regarding the deleted CCTV footage, because its exculpatory value is indeterminate. *Id.* The Court agrees. To invoke *Trombetta*, a defendant must demonstrate that the government destroyed evidence possessing an "apparent exculpatory value." *Trombetta*, 467 U.S. at 489; *Bohl*, 25 F.3d at 904. Conversely, to trigger the *Youngblood* test, "all that need be shown is that the government destroyed 'potentially useful evidence.'" *Youngblood*, 488 U.S. at 58; *Bohl*, 25 F.3d at 904. The Court in *Youngblood* defined "potentially useful evidence" as evidence of which "no more can be

said than that it could have been subjected to tests, the results of which *might* have exonerated the defendant." *Youngblood*, 488 U.S. at 57; *Bohl*, 25 F.3d at 910. Because the deleted CCTV footage of the interview room and processing area constitutes at most potentially useful evidence, as it is uncertain what the footage contained, the Court evaluates the claim under *Youngblood*.

Under *Youngblood*, a defendant has the burden to prove that the government acted in bad faith in destroying the evidence to establish a constitutional violation. *Bohl*, 25 F.3d at 910; *United States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016) ("Defendant bears the burden of showing that the missing evidence met that standard when it was lost.").

The Tenth Circuit enumerates five factors that courts should consider when determining whether the government destroyed evidence in bad faith: (1) whether the government was placed on notice of the potentially exculpatory value of the evidence; (2) whether the assertion that the evidence was potentially exculpatory was supported by objective, independent evidence; (3) whether the government possessed the evidence at the time of the notice; (4) whether the evidence was central to the government's case; and (5) whether there was an innocent explanation for the government's failure to preserve the evidence. *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1231 (10th Cir. 2024); *Bohl*, 25 F.3d at 914.

i. The Government Was Not on Notice Prior to June 16, 2026.

According to the parties' exhibits, the first document request for the video recording appears in an April 10, 2026 email from AUSA Judith Crews to Joshua M. Sifuentes, Shaun T. Crandall, and Delilah Gell. In the email, the AUSA asked to check "if there is any BWC[1] for this case." Doc. 48-6 at 1. On April 15, 2026, the AUSA sent a follow-up email requesting video recording of the interview, asking: "Can you please get the 214, the 215, any discovery off the

[1] "BWC" stands for "body-worn camera."

phone, and any BWC of the interview? Thanks." Doc. 48-10 at 4. Because Specialist Frazier later indicated that video recordings are retained for 90 days, the CCTV footage would have still been in the system during the AUSA's initial April 10, 2026 request. However, that request specified body-worn camera footage instead of CCTV footage. By the time of the follow-up email on April 15, 2026, the 90-day window expired, and the CCTV footage would have been deleted.

At this point, the record does not show that the defense requested videos, indicating that the AUSA acted on her own initiative. That same day, New Mexico AUSA Liaison Delilah Gell emailed Border Patrol Agent Erika Gonzalez, inquiring: "Can you check to see if you recorded this interview was recorded [sic]" and attaching Defendant's information. *Id.* at 2. On April 16, 2026, Agent Gonzalez replied to Gell, stating, "We checked out records for this event, and we did not record the interview." *Id.* at 1. This correspondence between Delilah Gell and Agent Gonzalez appears to reference body-worn camera footage, not CCTV surveillance video.

The record indicates that the defense first requested video recordings on June 16, 2026, in an email to Crews and SAUSA McGarry: "In particular, please confirm whether any of the agents involved utilized body-worn (lapel) cameras, or whether there is video surveillance from the Santa Teresa station reflecting our client's transport, detention, or questioning. To the extent such recordings exist, they are plainly relevant to the issues to be litigated at the suppression hearing and must be promptly produced." Mot. to Dismiss at 4. This email appears to be the first communication regarding CCTV surveillance footage. By that time, assuming the information provided by Supervisory Law Enforcement Information Systems Specialist Travis Frazier is correct, all video recordings from January 13, 2026 would have already been destroyed. *See* Doc. 48-18 at 1.

As the Court noted in its order denying Defendant's motion to suppress, "[a]n express written statement of waiver, such as the 'advice of rights' form signed by the defendant, is strong proof of the waiver's validity." *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *United States v. Boyd*, 31 F. App'x 601, 603 (10th Cir. 2002). While discovery was ongoing, the government knew that Defendant had signed both Form I-214, a Spanish language version of the *Miranda* rights, and Form I-215, a summary of the interview. Because these signed forms constituted strong evidence of a valid waiver, the underlying video footage lacked apparent exculpatory value prior to Defendant's specific request. Consequently, the government lacked notice before the system deleted the files in mid-April. Because Defendant did not make a request for the video until June 16, 2026, and did not challenge the voluntariness of his statement until June 20, 2026, the government had no basis to anticipate that the video recordings would become a matter of dispute. *See* Doc. 40 at 11–12.

The government made certain efforts to locate and preserve video evidence. As quoted above, on April 15, 2026, AUSA Crews independently inquired about the existence of body-worn camera footage and was informed that the interview was not recorded. *See* Doc. 48-10 at 1. This inquiry, made prior to any defense request, weighs against a finding of bad faith.

ii. Assertions of Potentially Exculpatory Value Lack Supporting Objective, Independent Evidence.

When Defendant first requested video recordings on June 16, 2026, and when he challenged the voluntariness of his statement in his reply brief, he presented no objective, independent evidence. Instead, Defendant asked the Court to draw a negative inference regarding the voluntariness of the statement and his consent to search the phone based on the absence of video recordings or a verbatim transcript. Because neither a recording nor a verbatim transcript is

a constitutional requirement, the absence of such evidence alone does not support an adverse inference.

iii. The Government No Longer Possessed the Recordings When Receiving the June 16, 2026 Notice.

By June 16, 2026, when the defense first requested the video recording, all footage from January 13, 2026 would have already been destroyed, assuming the information provided by Supervisory Law Enforcement Information Systems Specialist Travis Fraizer is accurate.

iv. The Evidence Was Not Central to the Government's Case.

Based on the records before the Court, the lost CCTV footage was not central to the government's case. Indeed, it appears it did not even occur to AUSA Crews that she could also request it on April 10, 2026, when she requested body-worn camera footage. Doc. 48-6 at 1. Nor did the government reference such recordings in its briefing.

v. There Was an Innocent Explanation for the Government's Failure to Preserve the Evidence.

The email correspondence between the Border Patrol and the AUSA indicates that the system only retains video footage for three months, and this appears to be what happened in this case. Specialist Frazier explicitly stated: "I went to STN and attempted to retrieve your video download and noticed the date was too far back as the system only goes back 3 months and records over sorry for the inconvenience that I could not get the video for you." Doc. 48-18 at 1. The limited retention period of the system provides a neutral explanation for the government's failure to preserve the footage.

Accordingly, all five factors indicate that the failure to preserve the CCTV footage of the Border Patrol station's processing area and the interview room is not attributable to bad faith.

## II. The Untimely Jencks Disclosure Does Not Warrant Dismissal.

Defendant next argues the government violated the Jencks Act by failing to turn over text messages between Agent Murillo and his supervisors until cross examination was underway. Mot. to Dismiss at 6.

The Jencks Act entitles a federal criminal defendant to obtain any pretrial statement and report made by a government witness, "following their testimony on direct examination *at the latest*." *United States v. Allen*, 603 F.3d 1202, 1210 (10th Cir. 2010); *United States v. Chanthadara*, 230 F.3d 1237, 1254 (10th Cir. 2000)(quoting 18 U.S.C. § 3500(b)) (holding that under the Jencks Act, "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified").

The plain language of the Jencks Act prevents the Court from ordering disclosure of a government witness's statements before that witness testifies on direct examination. *United States v. Tager*, 481 F.2d 97, 100 (10th Cir. 1973) ("Under the [Jencks Act], the defendant has no right to pre-trial discovery of statements made by government witnesses to the grand jury."); *see United States v. Mavrokordatos*, 933 F.2d 843, 846 (10th Cir. 1991) ("[T]he trial court was without authority to compel disclosure of pretrial Jencks material pursuant to 18 U.S.C. § 3500 and Fed. R. Crim. P. 16.").

The record indicates that defense counsel first requested early disclosure of Jencks materials on June 15, 2026, to which the government did not respond. *See* Mot. to Dismiss at 3. During cross examination, the government's witness, Agent Murillo, testified that he texted other agents while on the scene on January 13, 2026. Tr. 43:15–17. Following this admission, defense

counsel reinstated the Jencks request. Tr. 43: 18–23. As a result of this renewed request, the government produced two groups of texts.

The first is the conversation between Agent Murillo and his Supervisor, Lionel Marquez:

> Murillo: Sir this is Murillo R-77. I have a question about the addendum. If you can give me a call.
> Murillo: Sir addendum is finished. I'll be leaving in a few minutes unless you need me for something else.
> Marquez: Thank you for helping out brother, the USC[2] broke but no consent to speak to the Juvi. The guys are presenting.
> Murillo: Thanks for the help.

The second consists of two messages from Murillo's supervisor Robert Gonzalez:

> Robert Gonzalez: You good for a 21.[3]
> Robert Gonzalez: On the T&A I put AL for today.

Although this production was made after direct examination and during cross examination, which constitutes a late disclosure under the Jencks Act, the Act provides that a court, in its discretion, may recess a hearing or trial following the disclosure of a government witness's statement. This recess allows the defendant sufficient time to examine the statement and prepare for its use. 18 U.S.C. § 3500(c); *see also United States v. Vigil*, No. CR 05-2051, 2006 WL 8444440, at *3 (D.N.M. Mar. 31, 2006). After the government disclosed the text messages, the Court recessed the suppression hearing to allow the defense adequate time to prepare for cross-examination. Tr. 78:19–20.

After the recess, the defense cross-examined Agent Murillo regarding the newly disclosed text messages, inquiring whether he had made additional phone calls and whether his supervisor was referring to Defendant by using the term "USC." Tr. 84:22–Tr. 86:1.

---

[2] The acronym "USC" refers to Defendant, a United States citizen. *See* Mot. to Dismiss at 6.
[3] "21" stands for a phone call. Tr. 85: 10–11.

Courts have found that late Jencks disclosure caused no prejudice in instances where an opportunity for full cross-examination had been provided and where the trial court found no bad faith on the prosecutor's part. *United States v. Nevels*, 490 F.3d 800, 804 (10th Cir. 2007); *United States v. Heath*, 580 F.2d 1011, 1019 (10th Cir. 1978). Here, defense counsel received an opportunity to review the newly disclosed Jencks materials, which were not voluminous, and subsequently cross-examined Agent Murillo on the contents. In *United States v. Mavrokordatos*, the Tenth Circuit held that a district court abused its discretion by excluding government witness testimony as a sanction for late Jencks disclosure. 933 F.2d at 848. Because the materials were eventually made available, the defense had an opportunity to cross-examine the witness, and no prejudice occurred, the Tenth Circuit concluded that the sanction was not warranted. *Id.* Similarly, this Court finds that the delayed production of the text messages does not warrant the exclusion of Agent Murillo's testimony, nor does it justify the more extreme sanction of dismissing the indictment altogether. *See id.*

## III. No *Brady/Giglio* Violations Occurred.[4]

Defendant argues that the government violated *Brady* and *Giglio* by failing to timely turn over the following evidence: (1) text messages between Agent Murillo and his supervisors; (2) photographs of the scene that Agent Murillo potentially took and deleted; (3) photographs of the phone; (4) video recordings of the interview room and processing area at the Border Patrol station.

In order to establish a *Brady* violation, the defendant has the burden of demonstrating: "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *United States v. Geames*, 427 F.3d 1333, 1337 (10th Cir.

[4] Circuit courts split on the issue whether *Brady* restrictions apply to suppression hearings. The Tenth Circuit often analyzes the issue without directly deciding whether it applies to suppression hearings. *See Harmon*, 871 F. Supp. 2d at 1151. This Court thus analyzes the issue as if *Brady* applies to suppression hearings.

2005); *Banks v. Reynolds*, 54 F.3d 1508, 1516 (10th Cir. 1995). Evidence is considered "material" for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Harmon*, 742 F.3d 451, 459 (10th Cir. 2014). Mere speculation about whether evidence would have been favorable to the defendant is insufficient to support a *Brady* claim. *United States v. Anderson*, 62 F.4th 1260, 1271 (10th Cir. 2023).

a. <u>Text Messages Between Agent Murillo and His Supervisors</u>

On the day of the encounter, Lionel Marquez texted Agent Murillo that "the USC broke but no consent to speak to the Juvi." *See* Mot. to Dismiss at 6. The defense argues that the statement that Defendant "broke" directly bears on the voluntariness of his statement, and that the government's failure to timely disclose those text messages amounts to a *Brady/Gialio* violation. *See id.* at 6–7.

As an initial matter, it is unclear whether these text messages are favorable to Defendant or central to the defense. The only potentially favorable statement between Agent Murillo and his supervisors, "the USC broke but no consent to speak to the Juvi," does not necessarily bear directly on the voluntariness of Defendant's confession. Although Defendant argues that this statement implies his statement at the Border Patrol station was coerced, the more apparent interpretation of the message is that it simply refers to the fact that Defendant gave a statement, while noting that the Border Patrol agents had not obtained consent to speak to the juvenile.

Second, the timing of the production of these messages does not violate *Brady* or *Giglio*. While the delayed disclosure of *Brady* materials is strongly disapproved of, "[a]s long as ultimate disclosure is made before it is too late for the defendant[ ] to make use of any benefits of the evidence, Due Process is satisfied." *United States v. Warhop*, 732 F.2d 775, 777 (10th Cir. 1984); *see also Knighton v. Mullin*, 293 F.3d 1165, 1173 (10th Cir. 2002). Here, the defense had the

opportunity to review the text messages and cross-examine Agent Murillo on them. *See* Tr. 82:7–86:1. The Court considered that testimony when it ruled on the first motion to suppress. Consequently, Defendant was not prejudiced by the timing of the production of the text messages.

b. Photos of the Scene Possibly Taken and Deleted by Agent Murillo

The only photo of the scene in the record is an exhibit of Defendant's Notice of Supplementation of the Record. *See* Doc. 54-1. This photo depicts the red Mercedes-Bencz at the scene of the roadside encounter on January 13, 2026. Doc. 54 at 2. Any exculpatory value associated with this photo remains speculative.

Defendant does not argue that the late production or the suppression of this specific photo constitutes a violation. Instead, Defendant contends that the possibility that Agent Murillo deleted photos in this case, based on his testimony that he deleted photos of the crime scene during other investigations, constitutes *Giglio* impeachment material. Mot. to Dismiss at 11. Defendant obtained this admission from Agent Murillo during cross examination at the June 24, 2026 suppression hearing. Because this fact concerning Agent Murillo's prior practices came to light for the first time during the hearing, it is difficult to see how the government could have anticipated or produced it in advance. Furthermore, it is difficult to disclose a witness's general credibility or past unrecorded practices in unrelated cases as part of a pre-trial *Brady* or *Giglio* production.

Additionally, the timing of this disclosure did not prejudice Defendant. Defense counsel had an ample opportunity to cross-examine Agent Murillo on this fact and obtained testimony. The Court also considered that testimony when ruling on the motion to suppress to assess witness credibility. Consequently, this disclosure is not a *Giglio* violation.

c. Photos of Defendant's Phone

The defense briefly argues that the photos of the phone are favorable to Defendant "because the government failed to disclose these despite specific requests for the materials and because their

contents and the manner of their use during the interview bear on the voluntariness of [Defendant's] statement." Mot. to Dismiss at 12.

Without explaining what the phone contained and how that information was central to the defense or could have changed the outcome of the motion to suppress, Defendant failed to carry his burden to prove the second and third *Brady* prongs. *See McCormick v. Parker*, 821 F.3d 1240, 1246 (10th Cir. 2016).

After filing the motion to dismiss, Defendant filed a separate motion to suppress evidence derived from a blue iPhone, which the Court will decide independently. *See* Doc. 64. The delayed disclosure of the photo does not prejudice Defendant at this stage of the proceedings.

d. <u>Border Patrol Station Videos</u>

As the Court discussed in the preceding sections, the prosecution did not suppress the CCTV footage of Border Patrol station's processing area and interview room. Assuming the statement from Specialist Travis' is correct, the system cannot retrieve videos older than three months. As a result, Defendant cannot satisfy the first prong of the *Brady* framework, which requires a showing that the prosecution suppressed evidence. *See Geames*, 427 F.3d at 1337.

Secondly, because it is unknown whether the CCTV footage would have been favorable to Defendant, the defense's argument relies on the exact type of speculation that the Tenth Circuit has cautioned against. *See Anderson*, 62 F.4th at 1271 ("Mere speculation about whether evidence would have been favorable to the defendant is insufficient to support a *Brady* claim.").

A confession is involuntary "only if law enforcement overbore the defendant's free will and critically impaired the defendant's 'capacity for self-determination.'" *United States v. Pena*, 115 F.4th 1254, 1261 (10th Cir. 2024). The record indicates that Defendant signed Form I-214 and I-215 after receiving a verbatim reading of his *Miranda* rights in Spanish. *See* Tr. 91:17–21. Furthermore, the subject activity log indicates that Defendant received a hot meal prior to the

interview. *See* Doc. 40-1 at 2. Given these documented circumstances, the assertion that soundless, video-only CCTV footage would contain evidence favorable to the defense is entirely speculative.

The Tenth Circuit considers the following factors when assessing the voluntariness of a confession: (1) the Defendant's age, intelligence, and education; (2) the detention's length; (3) the questioning's length and nature; (4) whether law enforcement advised Defendant of his constitutional rights; and (5) whether law enforcement subjected Defendant to physical punishment. *Pena*, 115 F.4th at 1261.

The current record already supplies answers to the first, second, third, and fourth factors, which the Court considered when deciding the motion to suppress. As a matter of pure speculation, the CCTV footage could show whether law enforcement subjected Defendant to physical punishment. However, Defendant does not make any allegations or provide any proof that the agents physically threatened him during his interview. The Court declines to rely on speculation to find a *Brady/Giglio* violation here.

e. <u>Undisclosed *Brady* Material from the Juvenile's Case</u>

Again, Defense fails to establish any of the *Brady* elements. It is unverified based on the current record whether any such evidence exists in the juvenile's case, whether the government suppressed any evidence, or whether such information would be favorable to Defendant if it does exist. Moreover, it remains purely speculative whether any records from the juvenile's file would be central to the defense.

## IV. Rule 16 Violations

Defendant finally argues that the government violated Rule 16 and the Court's May 19, 2026 discovery deadline by withholding evidence and making untimely disclosures. Specifically, the government made the following untimely disclosures: (1) producing two reports and phone

evidence photographs on June 9, 2026; (2) withholding supervisor text messages and a new interview report until cross-examination on June 24, 2026; and (3) failing to produce the Border Patrol station videos. Mot. to Dismiss at 13.

The Tenth Circuit has held that when the government fails to comply with a discovery order, the factors the district court should consider in determining if a sanction is appropriate are: (1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith when it failed to comply with the discovery order; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance. *United States v. Wicker*, 848 F.2d 1059, 1061 (10th Cir. 1988).

The government attributes its delay in producing the two new reports to the fact that these materials only surfaced after the deadline.[5] *See* Resp. at 8. The Court finds no prejudice to Defendant, as the defense learned of these new facts before filing its reply. Defendant had an opportunity to address each new fact and raised two new arguments not contained in its initial motion to suppress, which the Court permitted specifically to prevent prejudice.

Regarding the text messages between Agent Murillo and his supervisors, as explained in the preceding sections, Defendant suffered no prejudice from the delay because the defense had time and opportunity to cross-examine Agent Murillo at the June 24, 2026 suppression hearing.

Similarly, Defendant is not prejudiced by the delayed production of the phone photographs because he filed a separate motion to suppress the phone evidence after receiving the requested materials, which the Court will evaluate separately. The record demonstrates that the government

[5] The last page of the report, which contained new and previously undisclosed facts, was dated June 9, 2026, while the preceding pages were dated April 21, 2026.

made good-faith efforts to locate the phone evidence and informed the defense upon discovering it. *See* Docs. 48-10, 48-11, 48-12.

Finally, regarding the Border Patrol station video footage, the Court finds that the government did not fail to produce it out of bad faith under *Youngblood*. The defense has shown no evidence suggesting Defendant's statement was involuntary, relying solely on the lack of a recording and expecting the Court to draw a negative inference.

Dismissal is "an extraordinary remedy" and is only used in cases of serious and flagrant prosecutorial misconduct. *United States v. Apodaca*, 820 F.2d 348, 349 (10th Cir. 1987). Because it is an extraordinary remedy, a district court may only dismiss an indictment when the defendant has been prejudiced. *United States v. Orozco*, 916 F.3d 919, 925 (10th Cir. 2019); *United States v. Villa-Chaparro*, 115 F.3d 797, 804 (10th Cir. 1997).

Defendants have the burden of proving outrageous government conduct. *United States v. McKissick*, 204 F.3d 1282, 1294 (10th Cir. 2000). "In order to prevail, the defendant must show that the challenged conduct violated notions of fundamental fairness and is shocking to the universal sense of justice." *Id.* Defendant here fails to carry this burden. With the exception of the deletion of the Border Patrol station video, which the Court finds does not amount to a constitutional violation, Defendant has received all requested materials well ahead of trial. Furthermore, the defense had a full opportunity to address these disclosures either in its reply brief or during cross-examination of government witnesses. Dismissal of the indictment based on Rule 16 violations is therefore not warranted.

**V. The Court Does Not Impose Alternative Sanctions at This Time.**

Although the Court does not find the delayed disclosures prejudicial at this time, the disclosure procedure in this case is troubling. It is the government's, and specifically its agent, the prosecutor's, responsibility to comply with disclosure obligations under the law. While the court

finds no bad faith in this instance, bad faith can, and will be, found if similar failures continue. Such a finding may result in sanctions, up to and including the exclusion of evidence or the initiation of criminal contempt proceedings, as deemed appropriate.

## CONCLUSION

Wherefore none of Defendant's arguments warrants the extreme sanction of dismissing the indictment altogether or justifies the alternative remedies requested by Defendant. The motion to dismiss is **DENIED**.

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**